ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| ECC International, LLC | )  ASBCA No. 58875 |
| | ) |
| Under Contract No. W917PM-07-D-0015-0006 | ) |

APPEARANCE FOR THE APPELLANT:          Michael A. Richard, Esq.
                                                                       Obermayer Rebmann Maxwell
                                                                         & Hippel LLP
                                                                       Philadelphia, PA

APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
                                                                       Engineer Chief Trial Attorney
                                                                     Sarah L. Hinkle, Esq.
                                                                     Geoffrey A. Mueller, Esq.
                                                                     Matthew Tilghman, Esq.
                                                                       Engineer Trial Attorneys
                                                                       U.S. Army Engineer District, Middle East
                                                                       Winchester, VA

OPINION BY ADMINISTRATIVE JUDGE STINSON

Appellant, ECC International, LLC (ECCI), appeals a contracting officer's (CO) deemed denial of its June 6, 2013, certified claim in the amount of $925,216.00 (R4, tab 2). The parties agreed to submit this appeal for a decision on the record without a hearing pursuant to Board Rule 11. Each party submitted initial and reply briefs. Also pending are the parties' cross-motions for summary judgment, as well as respondent's motion to dismiss for lack of jurisdiction. For the reasons stated below, we deny the government's motion to dismiss, dismiss the parties' cross-motions for summary judgment as moot, and deny the appeal.

FINDINGS OF FACT

**The MATOC Contract**

1. On August 15, 2007, the Government awarded ECCI Multiple Award Task Order Contract (MATOC) No. W917PM-07-D-0015, an Indefinite-Delivery, Indefinite-Quantity contract, "for general construction and construction related requirements such as repairs, and/or new construction, including the execution of

design-build construction work throughout Afghanistan." The contract anticipated award of task orders in the range of $5 million to $25 million. (R4, tab 3 at 142)

2. Paragraph 1.1 of the MATOC Scope of Work states, in part, that "[t]he vast majority of these projects will be new construction of relatively simple, one-and two-story living and working facilities similar to other 'normal' construction in Afghanistan, designed to be simple, durable, and easy/inexpensive to maintain" (R4, tab 3 at 147).

3. MATOC Scope of Work paragraph 1.4 states, in part:

> Where design-build services are required, the contractor shall employ the services of architect/engineering professional established in coordination with multi-discipline architectural/engineering design efforts. The Contractor's architect/engineering team shall be responsible for the coordination of all these disciplines in the performance of task order work.

(R4, tab 3 at 147)

4. Section 01335 of the MATOC is entitled "SUBMITTAL PROCEDURES FOR DESIGN-BUILD PROJECTS" (R4, tab 3 at 186). Paragraph 1.2.1, "DESIGN SUBMITTALS," states, in part:

> Contractor Furnished design submittals are the various design documents which primarily consist of specifications, drawings and design analysis and calculations. The Design-Build Contractor shall not begin construction work until the Government has reviewed the Design-Build Contractor's final design and has cleared it for construction. Clearance for construction shall not be construed as meaning Government approval. Unless otherwise indicated, the risk for the design is the sole responsibility of the Design-Build Contractor.
>
> As a minimum, design submittals shall be submitted at the following intervals:
>
> Concept design (35%): In addition to submission requirements, a design analysis/basis of design shall be required, including a proposed listing of specification sections.

> General design (65%): In addition to submission of designs, the contractor shall provide the design analysis, design specifications and design calculations.

> Final (100%): In addition to submission requirements, a final draft of specifications and design analysis/basis of design shall be required.

(R4, tab 3 at 187-88)

5. MATOC paragraph 1.2.2.1, "Contractor Furnished Government Approved Construction Submittals," states:

> Government approved construction submittals are primarily related to plans (Contractor Quality Control, Accident Prevention, Resident Management System, Area Use, etc.) schedules (Project Schedule/Network Analysis), and certificates of compliance. They may also include proposed variations to approved design documents in accordance with the paragraph entitled "VARIATIONS".

(R4, tab 3 at 188)

6. MATOC paragraph 1.3, "SUBMITTAL CERTIFICATION," states:

> The CQC organization shall be responsible for certifying that all submittals and deliverables have been reviewed in detail for completeness, are correct, and are in strict conformance with the contract drawings, specifications, and reference documents.

(R4, tab 3 at 188)

7. MATOC paragraph 1.3.1.2, "CQC System Manager Review and Approval," states:

> Prior to submittal, all items shall be checked and approved by the Design-Build contractor's Quality Control (CQC) System Manager. If found to be in strict conformance with the contract requirement, each item shall be stamped, signed, and dated by the CQC System Manager. Copies of the CQC organizations review comments indicating action taken shall be included within each submittal.

(R4, tab 3 at 188)

8.  MATOC paragraph 1.3.1.3, "Determination of Compliance," states:

> Each submittal shall be complete and in sufficient detail to allow ready determination of compliance with contract requirements by the Contracting Officer.  The contractor shall submit all required documentation with submittals. The U.S. Army Corps of Engineers (USACE) will not accept partial submittals.

(R4, tab 3 at 188)

9.  MATOC paragraph 1.3.2, "Responsibility for Errors or Omissions," states:

> It is the sole responsibility of the Design-Build Contractor to ensure that submittals do or do not comply with the contract documents.  Government review, clearance for construction, or approval by the Contracting Officer shall not relieve the Design-Build Contractor from responsibility for any errors or omissions in such drawings, nor from responsibility for complying with the requirements of this contract.

(R4, tab 3 at 188)

10.  MATOC paragraph 1.3.2.1, "Government Review," states:

> Government review, clearance for construction, or approval of post design construction submittals shall not be construed as a complete check, but will indicate only that the general method of construction, materials, detailing and other information are satisfactory.

(R4, tab 3 at 188-89)

11.  MATOC paragraph 1.3.3, "Substitutions," states:

> After design submittals have been reviewed and cleared for construction by the Contracting Officer, no resubmittal for the purpose of substituting materials or equipment will be

4

considered unless justified as indicated in the paragraph
entitled VARIATIONS.

(R4, tab 3 at 189)

12. MATOC paragraph 3.2.2, "Construction Submittal Register (ENG Form 4288)," states:

> Attached to this section is ENG Form 4288 which the
> Contractor is responsible for developing for this contract.
> All construction submittals shall be shown on this register.
> The submittal register shall be the controlling document
> and will be used to control all construction submittals
> throughout the life of the contract. The Contractor shall
> maintain and update the register on a monthly basis for the
> Contracting Officer's approval.

(R4, tab 3 at 198)

13. MATOC paragraph 3.6.4, "Variations," states, in part:

> If design documents or construction submittals show
> variations from the contract parameters and/or
> requirements, the Contractor shall justify such variations in
> writing, at the time of submission. Additionally, the
> contractor shall also annotate block "h" entitled "variation"
> of ENG FORM 4025. After design submittals have been
> reviewed and cleared for construction by the Contracting
> Officer, no resubmittal for the purpose of substituting
> materials, equipment, systems, and patented processes will
> be considered unless accompanied by the following:
>
> a. Reason or purpose for proposed variation, substitution,
> or revision.
>
> * * *
>
> If the Government review detects any items not in
> compliance with contract requirements or items requiring
> further clarification, the contractor shall be so advised.
> Lack of notification by the Contracting Officer of any
> non-complying item does not relieve the Contractor of any
> contractual obligation.

5

(R4, tab 3 at 204)

14.  MATOC paragraph 3.7.2, "Independent Design Review," states:

> The Design-Build Contractor shall have someone other
> than the Designer or Design Team perform an independent
> review of all specifications, drawings, design analysis,
> calculations, and other required data prior to submission to
> the Government.  Upon completion of this review, the
> Design-Build Contractor shall certify that each design
> submittal is complete, accurate, is in strict conformance
> with all contract requirements, that repetition has been
> avoided, that all conflicts have been resolved, and that the
> documents have thoroughly coordinated and cross checked
> against all the applicable disciplines to prevent the
> omission of vital information.

(R4, tab 3 at 205)

15.  MATOC paragraph 3.7.3, "Contractor's Quality Control Organization
Review," states, in part:

> Cleared for Construction does not relieve the Design-Build
> Contractor from the responsibility for any errors or
> omissions in the design, nor from responsibility for
> complying with the requirements of this contract.

(R4, tab 3 at 205)

16.  MATOC paragraph 3.7.4, "Government Review," states, in part:

> Contractor shall coordinate with the Contracting Officer
> and/or Representative(s) to register for DrChecks℠ use.
> The review will be for conformance with the technical
> requirements of the solicitation and the Successful
> Offeror's (Contractor's) RFP proposal.
>
> * * *
>
> Clearance for construction does not mean Government
> approval.  Government review shall not be construed as a
> complete check but will evaluate the general design

6

approach and adherence to contract parameters. The Government Review is often limited in time and scope. Therefore, the Contractor shall not consider any review performed by the Government as an excuse for incomplete work. Upon completion of the review, all comments will be forwarded to the contractor. The Contracting Officer will indicate whether the design submittal has or has not been cleared for construction using the following action codes:

A - Cleared for Construction

B - Cleared for Construction, except as noted in attached comments

C - Cleared for Construction, except as noted in attached comments, resubmission required

E - NOT Cleared for Construction, see attached comments, resubmission required

FX - Receipt acknowledged, does not comply as noted with contract requirements

These codes shall NOT be used by the Design-Build Contractor. Design-Build Contractor's quality Control Organization will annotate Block "g" entitled "FOR CONTRACTOR USE CODE" of Eng Form 4025-R using the action codes listed on the reverse side of the form.

Design submittals Cleared for Construction by the Contracting Officer shall not relieve the Contractor from responsibility for any design errors or omissions and any liability associated with such errors, nor from responsibility for complying with the requirements of this contract.

(R4, tab 3 at 205-06)

17. MATOC paragraph 3.7.4.1, "Incorporation of Government Review Comments," states, in part:

During the design review process, comments will be made on the design submittals that will change the drawings and specifications. The Government will make no additional payments to the Contractor for the incorporation of comments. Review comments are considered part of the design-build process.

The Contractor will be furnished comments from the various design sections of the Corps of Engineers, Afghanistan Engineer District (AED) and/or Europe District (EUD) and/or Transatlantic Program Center (TAC), as well as from other concerned agencies involved in the review process. The review will be for conformance with the technical requirements and parameters of the contract documents. The Contractor shall either incorporate each comment or, if the Contractor disagrees technically and does not intend to comply with the comment(s), the contractor shall clearly outline, with ample justification, its reason for its noncompliance within five (5) days after receipt of the comment(s). Additionally, the Contractor is cautioned in that if it believes the action required by any comment exceeds the requirements of this contract, that he should take no action and notify the Contracting Officer in writing immediately.

(R4, tab 3 at 206-07)

18. MATOC paragraph 3.7.5, "Design Discrepancies," states, in part:

Design-Build Contractor shall be responsible for the correction of incomplete design data, omissions, and design discrepancies which become apparent during construction. The Design-Build Contractor shall provide the Contracting Officer with a proposed recommendation for correcting a design error, within three (3) calendar days after notification by the Contracting Officer. The Contracting Officer will notify the Design-Build Contractor of any detected noncompliance with the foregoing requirements.

(R4, tab 3 at 207)

19. MATOC paragraph 3.8.5, "Commencement of Construction," states:

Construction of work may begin after receipt of the clearance for construction (Notice to Proceed) for each design phase. Any work performed by the Contractor prior to receipt of the clearance for construction, shall be at the Contractor's own risk and expense. Work cleared for construction that does not conform to the design parameters and/or requirements of this contract shall be corrected by the Contractor at no additional cost or time to the Government.

(R4, tab 3 at 208)

20. MATOC paragraph 3.10 sets forth "GENERAL DESIGN INSTRUCTIONS." Paragraph 3.10.1 sets forth "Responsibility of the Design-Build Contractor." Paragraph 3.10.1.1, "Professional Quality, Technical Accuracy, and Coordination," states:

The Design-Build Contractor shall be responsible for the professional quality, technical accuracy, and the coordination of all design specifications, drawings, and other services furnished under this contract. Work must be organized in a manner that will assure thorough coordination between various details on drawings, between the various sections of the specifications, and between the drawings and specifications. The Design-Build Contractor shall thoroughly cross-check and coordinate all work until he is professionally satisfied that no conflicts exit, vital information has not been omitted, and that indefinite language open to interpretation has been resolved.

(R4, tab 3 at 210)

21. MATOC paragraph 3.10.2.4, "Technical Criteria," states, in part:

All designs, drawings, and specifications shall be prepared in accordance with the contract documents and with the applicable publications referenced therein.

* * *

Any deviations from the technical criteria contained in the contract documents or in the applicable publications,

9

including the use of criteria obtained from the user or other sources, must receive prior approval of the Contracting Officer. Where the technical criteria obtained or referred to herein are not met, the Design-Build Contractor will be required to conform his design to the same at his own time and expense.

(R4, tab 3 at 211-12)

22. MATOC paragraph 3.10.3, "Design Priorities," states, in part, "[t]he design of this project shall consider the remote location and harsh environment of the projects and the impact this will have on technical supply, the cost of construction, the low level of maintenance, and the difficulty of finding replacement parts" (R4, tab 3 at 212).

23. MATOC paragraph 3.14.3, "Government Approval of Design Submittals," states, in part:

> The approval of construction submittals by the Contracting Officer shall not be construed as a complete check, but will indicate only that the general method of design construction, materials, detailing and other information are satisfactory. Approval will not relieve the Design-Build Contractor of the responsibility for any error which may exist, as it is the sole responsibility of the Design-Build Contractor to certify that each submittal has been reviewed in detail and is in strict conformance with all the contract documents and design criteria referenced therein.

(R4, tab 3 at 217)

24. The MATOC contained design specifications prepared by Michael Baker, Jr., Inc. (Baker) under a separate contract with the government (R4, tab 4 at 1). Section 01 33 00 set forth "SUBMITTAL PROCEDURES" (R4, tab 4 at 271). Paragraph 1.3.1 of the MATOC design specifications, "Designer of Record Approved," states:

> Designer of Record approval is required for extensions of design, critical materials, any deviations from the solicitation, the accepted proposal, or the completed design, equipment whose compatibility with the entire system must be checked, and other items as designated by the Contracting Officer. Within the terms of the Contract

10

Clause entitled "Specifications and Drawings for Construction", they are considered to be "shop drawings". The Contractor shall provide the Government the number of copies designated hereinafter of all Designer of Record approved submittals. The Government may review any or all Designer of Record approved submittals for conformance to the Solicitation and Accepted Proposal. The Government will review all submittals designated as deviating from the Solicitation or Accepted Proposal, as described below. Generally, design submittals should be identified as SD-05 DESIGN DATA submittals.

(R4, tab 4 at 274)

25. MATOC design specification paragraph 1.3.2, "Government Approved," states:

Government approval is required for extensions of design, critical materials, deviations, equipment whose compatibility with the entire system must be checked, and other items as designated by the Contracting Officer. Government approval is required for any deviations from the Solicitation or Accepted Proposal and other items as designated by the Contracting Officer. Within the terms of the Contract Clause entitled "Specifications and Drawings for Construction," they are considered to be "shop drawings."

(R4, tab 4 at 274)

26. MATOC design specification paragraph 1.3.3, "Government Reviewed Design or Extension of Design," states:

The Government will review all (65%) and (75%) design submittals for conformance with the technical requirements of the solicitation. Government review is required for extension of design construction submittals, used to define contract conformity, and for deviation from the completed design. Review will be only for conformance with the contract requirements. Included are only those construction submittals for which the Designer of Record design documents do not include enough detail to ascertain contract compliance. The Government may,

11

but is not required, to review extensions of design such as structural steel or reinforcement shop drawings.

(R4, tab 4 at 274)

27. MATOC design specification paragraph 1.4, "Approved Submittals," states:

> The Contracting Officer's approval of submittals shall not be construed as a complete check, but will indicate only that the general method of construction, materials, detailing and other information are satisfactorydesign [sic], general method of construction, materials, detailing and other information appear to meet the Solicitation and Accepted Proposal. Approval will not relieve the Contractor of the responsibility for any error which may exist, as the Contractor under the Contractor Quality Control (CQC) requirements of this contract is responsible for design, dimensions, all design extensions, such as the design of adequate connections and details, etc., and the satisfactory construction of all work. After submittals have been approved by the Contracting Officer, no resubmittal for the purpose of substituting materials or equipment will be considered unless accompanied by an explanation of why a substitution is necessary.

(R4, tab 4 at 275)

28. MATOC design specification paragraph 1.10.2, "Deviations," states:

> For submittals which include proposed deviations requested by the Contractor, the column "variation" of ENG Form 4025 shall be checked. The Contractor shall set forth in writing the reason for any deviations and annotate such deviations on the submittal. The Government reserves the right to rescind inadvertent approval of submittals containing unnoted deviations.

(R4, tab 4 at 277)

29. The MATOC design specifications included section 09 22 37.00 10, "LATHING AND PLASTERING," which set forth instructions for installing lath and

12

plaster ceilings (R4, tab 4 at 532-43). The MATOC design specifications contained no specifications concerning installation of acoustical tile ceilings (R4, tab 4).[1]

30. The MATOC incorporated by reference FEDERAL ACQUISITION REGULATION (FAR) 52.236-21, SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION ALT I (FEB 1997) (R4, tab 3 at 149). Sections (e) and (f) provide:

> (e) If this contract requires shop drawings, the Contractor shall coordinate all such drawings, and review them for accuracy, completeness, and compliance with contract requirements and shall indicate its approval thereon as evidence of such coordination and review. Shop drawings submitted to the Contracting Officer without evidence of the Contractor's approval may be returned for resubmission. The Contracting Officer will indicate an approval or disapproval of the shop drawings and if not approved as submitted shall indicate the Government's reasons therefor. Any work done before such approval shall be at the Contractor's risk. Approval by the Contracting Officer shall not relieve the Contractor from responsibility for any errors or omissions in such drawings, nor from responsibility for complying with the requirements of this contract, except with respect to variations described and approved in accordance with (f) below.
>
> (f) If shop drawings show variations from the contract requirements, the Contractor shall describe such variations in writing, separate from the drawings, at the time of submission. If the Contracting Officers approves any such variation, the Contracting Officer shall issue an appropriate contract modification, except that, if the variation is minor or does not involve a change in price or in time of performance, a modification need not be issued.

48 C.F.R. § 52.236-21.

---

[1] Appellant's cross-motion did not contest this fact (gov't mot. at 9 ¶¶ 5-6; app. cross-mot. at 2).

**Task Order No. 0006**

31.  On May 22, 2008, Rahmat Sadat Construction Company (RSCC) submitted to ECCI its "offer to design/build the Afghanistan National Border Police Zone Command (BP Zone) Type B facilities project in accordance with ECCI/USACE RFP-00XX, Certifications & Representations, Scope of Work, Technical Requirements, Drawings and Specifications."  RSCC agreed to "provide all design, management, materials, equipment, labor, technical support, and insurance, to implement and complete the project requirements for *USD* $7,014,126.88."  (R4, tab 200)

32.  On May 29, 2008, the Government awarded ECCI Task Order No. 0006 (the Task Order) in the amount of $13,498,448.00, for the design and construction of a Border Patrol Zone Command facility for the Afghan National Police (ANP), in Kandahar, Afghanistan (R4, tab 19 at 1280-81).

33.  The Task Order Scope of Work, paragraph 1.1, states:

> This project consists of the design and construction of site improvements and construction of facilities to support the Afghanistan National Border Police Zone Command (BP Zone), Type B Facilities (577 People) in Herat/Kandahar/ Mazar-e-Sharif, Afghanistan.  This project is defined as the management, design, material, labor, and equipment to design and construct and/or refurbish all utilities, roads, buildings, force protection measures, site security, demining activities, and other features as referenced herein.

(R4, tab 19 at 1282)

34.  The Task Order Scope of Work, paragraph 1.2, states:

> The site improvement work shall include the preparation of design documents and the subsequent construction of the site improvements described within this Section, Section 01015 and the Drawings with modifications to fit the actual site selected.  The facilities required for each site shall include structures as indicated in the Drawings and Specifications and contain all connections of utilities as shown on the Drawings. All sitework and facilities may require modifications to meet site conditions and these modifications shall be designed and constructed in accordance with current U.S. and International

14

Building Codes and standards and as described in these documents. Any standard that can be determined to be substantially equivalent to the standards specified in this document may be used, but it is the Contractor's responsibility to show the equivalency of the alternate standard and the Contracting Officer must approve its use. A partial listing of references is included within the Request for Proposal.

(R4, tab 19 at 1282)

35. The Task Order Scope of Work, paragraph 2, "GENERAL REQUIREMENTS FOR THE POLICE PROGRAM," includes paragraph 2.1, "Contractor Requirements," which states, in part:

The contractor shall design and construct the site improvements and facility modifications to meet site conditions as a design-bid-build contract and shall be in accordance with the requirements stated in Section 01015: Technical Requirements. Refer to attachment following this section for more specifics for required information. The buildings and fueling facilities have been designed and are to be constructed as indicated herein.

(R4, tab 19 at 1283)

36. The Task Order Scope of Work, paragraph 1.3, states, in part:

Site Improvement Design Work shall be executed in accordance with the technical requirements described herein Section 01015, and the Technical Specifications, and Drawings. In case of question or ambiguity, the Contracting Officer (KO) shall make the final decision.

(R4, tab 19 at 1282)

37. The Task Order Technical Requirements (01015), paragraph 1.1, states:

The Contractor's design and construction must comply with technical requirements contained herein. The Contractor shall provide design and construction using the best blend of cost, construction efficiency, system

15

durability, ease of maintenance and environmental compatibility.

(R4, tab 19 at 1287)

38. The Task Order Technical Requirements (01015), paragraph 1.2, states:

> These design and product requirements are minimum requirements. The Contractor is encouraged to propose alternate design or products (equipment and material) that are more commonly used in the region; will be equally or more cost effective or allow for more timely completion, but furnish the same system durability, ease of maintenance and environmental compatibility. The Contractor will be required to submit information as requested by the Contracting Officer to make a comparison of the proposed alternate. All variations must be approved by the Contracting Officer.

(R4, tab 19 at 1287)

39. The Task Order Technical Requirements (01015), paragraph 1.8, "List of Codes and Technical Criteria," incorporated by reference Unified Facilities Criteria (UFC) 1-300-07A, "Design Build Technical Requirements" (R4, tab 19 at 1290-91).

**The Baker Drawings**

40. The Task Order contained drawings prepared by Baker (the "Baker drawings") (R4, tab 20). Ceiling Plan Note 3 in drawings A-A4 and A-A5, depicting the Administration Building, states that "[a]ll ceiling surfaces shall be painted plaster on metal lath" (R4, tab 20 at 1318-19). Ceiling Plan Note 2 in drawing D-A3, depicting the Shower and Latrine Building, states that "[a]ll ceiling surfaces shall be painted plaster on metal lath" (R4, tab 20 at 1364). Ceiling Plan Note 2 in drawing E-A3, depicting the Barracks, states that "[a]ll ceiling surfaces shall be painted plaster on metal lath" (R4, tab 20 at 1376). Ceiling Plan Note 2 in drawing F-A3, depicting the Women Barracks, states that "[a]ll ceiling surfaces should be painted plaster on metal lath" (R4, tab 20 at 1386). Ceiling Plan Note 3 in drawings G-A4 and G-A5, depicting the Senior and High Barracks, states that "[a]ll ceiling surfaces shall be painted plaster on metal lath" (R4, tab 20 at 1398-99). Ceiling Plan Note 2 in drawing H-A1, depicting the Warehouse, states that "[a]ll ceiling surfaces shall be painted plaster on metal lath," and Detail 7 on Warehouse drawing H-A2 indicates installation of a metal lath and plaster ceiling (R4, tab 20 at 1412-13). Ceiling Plan Note 2 in drawing I-A3, depicting the Laundry facility,

states that "[a]ll ceiling surfaces shall be painted plaster on metal lath" (R4, tab 20 at 1418). Detail 3 on drawing J-A3, and the corresponding legend, indicates installation of "plaster on metal lath" in certain portions of the Vehicle Maintenance facility (R4, tab 20 at 1429). Details 4 and 5 on drawing S-A1, indicate installation of a "metal lath and plaster ceiling" in the One Story Building, Administration Building, and the High and Senior Barracks (R4, tab 20 at 1487). Detail 4 on drawing S-A2, indicates installation of a "metal lath and plaster ceiling" in Middle Barracks and the Shower and Latrine, and the Laundry Building (R4, tab 20 at 1488). Drawing S-A13, setting forth standard details, includes a diagram depicting a "Suspended Plaster Ceiling" in Details 12 and 13, indicating installation of "plaster on metal lath" (R4, tab 20 at 1499). Drawing S-E3, setting forth Electrical, includes a diagram depicting Typical Detail For Surface Mounted Light Fixtures, indicating installation of "metal lath and a plaster (finished ceiling)" (R4, tab 20 at 1527).

41. The Baker drawings included in the Task Order did not include any detail or other information requiring installation of acoustical tile ceilings (R4, tabs 4, 20).[2]

**ECCI Design Submittals**

42. ECCI submitted to the government ENG Form 4025, "Transmittal Of Shop Drawings, Equipment Data, Material Samples, Or Manufacturer's Certificate Of Compliance," Transmittal No. 01335-1, requesting approval of the 35 percent design package.[3] The transmittal was dated October 6, 2008, and marked received by the government that same day. In column "h," entitled "VARIATION," the contractor indicated "N." In submitting the transmittal to the government, the contractor stated: "I certify that the above submitted items have been reviewed in detail and are correct and in the strict conformance with the contract drawings and specifications except as otherwise stated." (App. supp. R4, tab 142)

43. On October 7, 2008, ECCI submitted ENG Form 4025, Transmittal No. 01335-2, with a Submittal Register attached, listing over 200 specifications

---

[2] Appellant's cross-motion did not contest this fact (gov't mot. at 9 ¶ 4; app. cross-mot. at 2).

[3] The reverse side of ENG Form 4025, which does not appear in the record, sets forth instructions for the contractor to follow, including the requirement that it place a check in the column marked "VARIATION" if the submittal is not in accordance with the contract plans and specifications, and provide a written statement to that effect in the remarks column. *Gramoll Constr. Co.*, ASBCA No. 44514, 96-1 BCA ¶ 27,975 at 139,725, *aff'd*, 121 F.3d 725 (Fed. Cir. 1997) *per curiam* (table); *D.E.W., Inc.*, ASBCA No. 35759, 92-1 BCA ¶ 24,520 at 122,359.

(app. supp. R4, tab 165). Included in the list of specifications is a reference to specification 09 51 00, "SD-03 Acoustical Ceiling Systems" (app. supp. R4, tab 127 at 30697). In column "h," entitled "VARIATION," on the ENG Form 4025, the contractor indicated "N." In submitting the transmittal to the government, the contractor stated: "I certify that the above submitted items have been reviewed in detail and are correct and in the strict conformance with the contract drawings and specifications except as otherwise stated" (app. supp. R4, tab 127 at 30695).

44. The government approved the Submittal Registry on October 7, 2008, stating, "Submittal Register needs to be updated per general specification requirements" (app. supp. R4, tab 127 at 30695-96). ECCI states in its brief that the Submittal Registry "did not include Specification § 09 22 37 LATHING AND PLASTERING" (app. br. at 6). Specification 09 22 37.00 10 was included in the MATOC design specification (R4, tab 4 at 532-43).

45. ECCI alleges in its complaint that it "reasonably interpreted the contract documents as allowing design and installation of acoustical tile ceilings in the buildings required by the RFP" and "reasonably bid design and installation of acoustical tile ceilings for the buildings required by the RFPs" (compl. ¶¶ 22-23).

46. Joseph Huizar, an ECCI design manager, conducted a review of the contractor's various design submissions for "ceiling drawings," and reported his findings to Thomas Stoneham, ECCI Senior Project Manager, as follows:

> Per RFP plaster ceilings.
> 35% plaster 27 Sep 08
> 65% plaster 05 Dec 08
> 65% R1 ceiling board 10 Jul 09
> 99% ceiling board 05 Nov 09

(R4, tabs 249 at 8298, 266 at 8385, 369 at 10008)[4]

**ECCI's 65 Percent Design**

47. RSCC is identified on the original 65 percent design drawings, the 65 percent design resubmittal drawings, and the 99 percent design drawings, as the "Subcontractor/ Designer" (app. supp. R4, tabs 130, 132, 137). RSCC developed the 65 percent and 99 percent drawings, as well as the design narrative (R4, tab 369 at 10007).

---

[4] It appears that the record does not contain a copy of the September 27, 2008, 35 percent drawings.

18

48. ECCI submitted to the government ENG Form 4025, Transmittal No. 01335-3, requesting approval of the 65 percent design package. The transmittal was dated December 27, 2008, and marked received by the government on January 11, 2009. On the first page of the document, ECCI entered "N" in block "h," under the heading "VARIATION," and on the second page under the column "Variation," stated "No." In signing the transmittal, ECCI certified that "the above submitted items have been reviewed in detail and are correct and in the strict conformance with the contract drawings and specifications except as otherwise stated." The government signed the document on February 8, 2009, stating "Comments in DR checks, resubmittal required." (App. supp. R4, tab 167)

49. The 65 percent design submittal drawings dated December 26, 2008, stated, "All Ceiling Surfaces Shall Be Ceiling Board Panel" for the Administration Building, the Women's Barracks, and the Senior and High Barracks (app. supp. R4, tab 130 at 25922, 28513, 28525-26). For the Laundry building, the drawings stated "All Ceiling Surfaces Shall Be Painted Plaster On Metal Lath" (app. supp. R4, tab 130 at 28554).

50. The 65 percent design resubmittal drawings, dated July 10, 2009, stated "All Ceiling Surfaces Shall Be Ceiling Board Panel" for the Administration Building (Note 3), the Shower and Latrine Building (Note 2), Barracks (Middle/Ordinary) (Note 2), the Women's Barracks (Note 2), the Senior and High Barracks (Note 3), and the Warehouse (Note 2) (app. supp. R4, tab 132 at 18312-54). For the Laundry building, the drawing stated "All Ceiling Surfaces Shall Be Painted Plaster On Metal Lath" (Note 2) (app. supp. R4, tab 132 at 18358).

51. The 65 percent design narrative executive summary states, "[t]he complete design of this project was provided by ECCI/AED to RSCC, RSCC is to site adopt the design based on site condition" (R4, tab 217 at 6091).[5] The 65 percent design narrative states also, "[i]n general, interior wall construction shall be painted cement plaster applied to CMU. The interior of outside perimeter walls shall be painted plaster on metal lath. Ceiling systems shall be suspended cement plaster." (R4, tab

---

[5] The design narrative is undated. The government's Rule 4 index identifies the document as "July 10, 2009, Design Narrative, 65 Percent" (R4, tab 000, "ASBCA 58875 Gov Supp TOC"). Appellant's brief suggests that the design narrative pertained to the original 65 percent design (app. cross-mot. at 7 ¶ 31, citing R4, tab 217 at 6104-6105). The government's brief suggests that the design narrative concerned appellant's revised 65 percent design (gov't br. at 6). Regardless of whether the design narrative applies to the original 65 percent design or the revised design, it is reflective of appellant's less than exacting compliance with the MATOC and the Task Order requirements. We refer to it, herein, as simply the 65 percent design narrative.

217 at 6104-05)  The 65 percent structural design calculations were based upon, and indicted use of, plaster ceilings (R4, tabs 226 at 6902, 6904-05, 227 at 7374, 7376-77).

52.  The 65 percent design resubmittal specifications included specification sections for metal support assemblies, lathing and plastering, and gypsum board (R4, tab 218 at 6111, 6389, 6392, 6410).  The document contained no specification section for acoustical tile ceilings, other than a reference to acoustical ceilings in (1) Section 05 50 00, "METAL:  MISCELLANEOUS AND FABRICATIONS," as part of a discussion regarding access panels, and (2) Section 05 51 00.00 40, "METAL STAIRS," referencing ASTM C 636/C 636M (2006), "Standard Practice for Installation of Metal Ceiling Suspension Systems for Acoustical Tile and Lay-In Panels" (R4, tab 218 at 6240, 6244).

53.  In response to the original 65 percent design submittal, the government submitted comment "2248956 Architectural," stating, in part:

> Contractor shall construct all features of work (architectural, structural, mechanical, plumbing and electrical) included in the contract plans and specifications furnished by AED as part of this contract.  No changes or variations are permitted to work shown in the given foundation dimensions and/or materials shown on the furnished drawings are not adequate [sic].  In this case only, all necessary geotechnical data from a given project site plans (and specification if applicable) and [sic] submitted for review and approval by AED at the 35% design submittal schedule milestone.  Even if foundation design changes are required, all other features of work shall be accomplished in strict compliance with the drawings, details and specifications provided by AED in the contract.

(App. supp. R4, tab 115 at 6529)  ECCI's response, submitted on April 15, 2009, stated:  "Concurred, It has been complied."  The comment was then closed without further comment.  (App. supp. R4, tab 115 at 6530)

**RFI 0009**

54.  On July 9, 2009, ECCI submitted to the government RFI 0009 concerning "Solicitation No. W917PM-07-R-0105 3.4.2."  The RFI referenced specification

sections 3.4, "Exterior Building Envelope," and section 3.4.2.[6]  The subject of RFI 0009 was "Interior Wall Finish," and discussed the "Exterior Building Envelope" and the interior covering of exterior walls.  The information requested was as follows:

> Solitation [sic] No. W917PM-07-R-0105 Medium Construction MATOC stated the following in regards to the building interior finishes
>
> 3.4 Exterior Building Envelope.
>
> 3.4.2 Wall insulation shall be 100mm rigid insulation applied between 100mm metal studs on the inside surface of the building exterior wall covered with metal lath and plaster.
>
> In order to provide the Government a better finished product (straighter walls by avoiding wavy metal lath between studs), is gypsum board (drywall) acceptable in lieu of plaster over metal lath?
>
> This susbstitution [sic] is consistent with adjacent Metag constructed buildings, and would be used on all exterior walls, and a suspended/drop ceiling would be used rather than drywall ceiling.  This would be a no cost change to the Government.

(App. supp. R4, tabs 92, 93 at 6438)  The RFI stated the following in bold letters at the bottom of the form:

> NOTE:  THE RFI SYSTEM IS INTENDED TO PROVIDE AN EFFICIENT MECHANISM FOR RESPONDING TO CONTRACTOR'S REQUESTS FOR INFORMATION.  IT DOES NOT PROVIDE AUTHORITY TO PROCEED WITH ADDITIONAL WORK.  IF THE CONTRACTOR CONSIDERS THE RFI RESPONSE A CHANGED CONDITION, PROVIDE

---

[6] The Board requested appellant submit a copy of the solicitation specification referenced in RFI 0009.  In response, appellant provided an excerpt of the design analysis prepared by Baker, which, according to appellant, is the document referenced and paraphrased in the RFI.  The Board has added appellant's cover letter and design analysis excerpt to the record as app. supp. R4, tabs 181-82.

WRITTEN NOTICE TO THE CONTRACTING
OFFICER'S REPRESENTATIVE IN ACCORDANCE
WITH CONTRACT PROVISIONS.

(App. supp. R4, tab 92)

55. The design analysis prepared by Baker, and provided by the government with the original RFP, includes section 3.4.2, "Walls," which states:

> The walls will be reinforced and tied to the steel building frame as required. The exterior face of wall will have a stucco finish. On the interior side of the wall surfaces 100mm of rigid insulation will be applied. The interior finish of the exterior walls will be cement-plaster on metal lath.
>
> Lintels in exterior walls will be reinforced cast in place concrete, or reinforced concrete masonry lintel blocks. Similarly, sloping sills will be either cast in place or concrete masonry shapes with a cement wash or stainless steel sill.

Section 3.5, "Interior Construction and Finishes," states, in part, "[c]eiling systems shall be suspended cement plaster." (App. supp. R4, tabs 181, 182 at 25)

56. According to a Quality Assurance Report (QAR) dated July 11, 2009, and prepared by Michael D. Conner, a government quality assurance representative, "pending RFI's" were discussed, including the RFI "for wall board to replace lath and plaster" (R4, tabs 201 at 2544, 368 at 9957). The QAR makes no mention of the specifics of that discussion. On July 22, 2009, Philip Kadala, a government Environmental Engineer, responded to RFI 0009, stating "[t]he proposed substitution of gypsum wallboard in lieu of plaster on lath of the interior of exterior walls is acceptable provided the appropriate revisions to the specifications are prepared and approved." The government's response did not mention installation or approval of a suspended/drop ceiling in lieu of a drywall ceiling (as referenced in RFI 0009). (App. supp. R4, tab 92 at 6439).

57. Neither the MATOC, nor the Task Order, specified installation of a drywall ceiling, as referenced in RFI 0009 (findings 29, 40-41).

22

**Sample Room and Transmittals**

58. In July 2009, ECCI constructed a sample room in the Administration Building which included an acoustical tile ceiling (R4, tabs 201 at 2549, 202 at 4074, 4077). Mr. Conner, and fellow quality assurance representative George Edgington, subsequently observed the sample room (R4, tab 201 at 2750).

59. On August 7, 2009, the 65 percent design re-submittal, dated July 13, 2009, was cleared for construction with a B-code (B - Cleared for Construction, except as noted in attached comments) (app. supp. R4, tab 135, finding 16). The DrChecks comments to the 65 percent design resubmittal did not mention the acoustical tile ceiling system (app. supp. R4, tab 171).

60. On August 10, 2009, ECCI prepared ENG Form 4025, Transmittal No. 09 51 00-1, which contained product data for acoustical ceiling tile. In column "h," entitled "VARIATION," the contractor indicated "N." The transmittal was signed by Freddie Malone, and certified "that the above submitted items have been reviewed in detail and are correct and in strict conformance with the contract drawings and specifications except as otherwise stated." (R4, tab 234) On August 10, 2009, ECCI prepared ENG Form 4025, Transmittal No. 09 51 00-2, which included acoustical tile samples. In column "h," entitled "VARIATION," the contractor indicated "N." The transmittal likewise was signed by Mr. Malone, and certified "that the above submitted items have been reviewed in detail and are correct and in strict conformance with the contract drawings and specifications except as otherwise stated." (R4, tab 235)

61. On August 13, 2009, the Government cleared the acoustical tile samples (Transmittal 09 51 00-2) for construction with a C-code, requiring resubmission, stating, "submit with complete shop drawings for suspended ceiling" (R4, tabs 39 at 1697, 236 at 7863).

**ECCI's 99 Percent Design**

62. The 99 percent design drawings, dated October 20, 2009, stated "All Ceiling Surfaces Shall Be Ceiling Board Panel" for the Administration Building (Note 3), the Shower and Latrine Building (Note 2), Barracks (Middle/Ordinary) (Note 2), the Women's Barracks (Note 2), and the Senior and High Barracks (Note 3). The Training Facility called for a metal panel ceiling (Note 1). The Vehicle Maintenance Building called for a combination of metal panel ceiling and ceiling board (Notes 1 and 3). For the Laundry building, the drawing stated "All Ceiling Surfaces Shall Be Painted Plaster On Metal Lath" (Note 2). (App. supp. R4, tab 137)

63. Appellant prepared ENG Form 4025, Transmittal No. 09 51 00-2.1, dated January 4, 2010, for the acoustical tile samples. In column "h," entitled

"VARIATION," the contractor indicated "N." The transmittal was signed by Mr. Malone, certifying "that the above submitted items have been reviewed in detail and are correct and in strict conformance with the contract drawings and specifications except as otherwise stated." (R4, tab 39 at 1698) Appellant prepared ENG Form 4025, Transmittal No. 09 51 00-3, dated January 17 2010, for the acoustical ceiling shop drawings, product data, and samples. ECCI entered "N" in block "h," under the heading "VARIATION" for each of the items. The transmittal signed by Mr. Malone, certifying "that the above submitted items have been reviewed in detail and are correct and in strict conformance with the contract drawings and specifications except as otherwise stated." (R4, tab 39 at 1699)

**Acoustical Tile Ceiling Dispute**

64. By email and Serial Letter No. C-0027, both dated January 20, 2010, Ken Parker, Area Engineer, informed Bob Anness, ECCI Construction Manager, that the ceilings were not in conformance with the MATOC contract or the Task Order, stating:

> The 2' X 2' dropped in acoustical ceiling currently being installed in the M&O Barracks does not meet the contract requirements. Plaster and painted ceilings are required. This deviation from the contract is not acceptable. Such a ceiling in not in accordance with ANP policy. Such ceilings have short and long term maintenance issues, things can be concealed above them, concussions/vibrations from training exercises munitions firing and controlled detonations could shake them out of alignment, etc. Please provide your plan of how you will correct this noncompliant work while still meeting the scheduled contract completion date.

(R4, tabs 33, 266 at 8386)

65. The contractor's January 20, 2010, Quality Control Report (QCR) states:

> A hold order in work activity for drop ceilings in M&O Barracks was implemented and waiting to resume after the resolution has been made. Relevant specifications section 09 51 00 Acoustical Ceilings boards and grids. In approved 65% design specify the used [sic] of plaster board ceiling with metal lath while in 99% design, alteration was made using the acoustical drop ceilings.

(R4, tab 202 at 4609)

66. By letter dated February 1, 2010, Chris Canon, ECCI Contracts Manager, responded to the government's Serial Letter No. C-0027. Mr. Canon stated, in part:

> As you know, this is a design build project that has required significant modifications to the buildings and materials envisioned in the original Government provided design documents in order to adapt to local site conditions and locally available materials. The Government routinely approves design adaptations during the normal course of the design and submittal processes in accordance with Section 01010, Paragraph 1.2, which states all site work and facilities may require modification to meet site conditions.

Mr. Canon stated that on August 7, 2009, the government approved "the suspended grid ceiling system" in appellant's "July 12, 2009 65% design submission," approved a mockup of the ceiling "which was inspected and approved on July 23, 2009 by Michael Conners [sic] and George Edgington, and approved material submitted for the ceiling tile on August 13, 2009. Mr. Canon also challenged the government's position that an ANP policy prohibits use of acoustical tile ceilings, and stated that an acoustical tile ceiling was specified by the government in another MATOC task order. (R4, tab 35)

67. By email to Mr. Anness dated February 3, 2010, Mr. Edgington, stated, in part:

> I have read the letter which was sent to the Corps of Engineers and want to make a couple issues very clear. This is not a Design Build project, it is site adapt. You are not authorized to change the Baker Drawings without approval. The reviewers do not necessarily review the Baker Drawings during a review, they do review areas which may have been approved for change. Then, they review any site adapt information.
>
> Mike Conner and I did look at the sample room, when, I do not know. I am not even sure that the ceiling was installed and if so, what was installed. Your letter states that the sample room was looked at on 23 July 2009. According to the COE daily reports Mike Conner had no site visits 3 Jun 09 - 24 Jul 09, no vehicle support to visit the site.

25

We did look at the sample room, however, it was not an inspection and it did not happen on 23 Jul 09.

The letter states that the material submittal for the ceiling tile was approved on 13 Aug 09 by Mike Conner. The submittal was not approved, it was a code "C", resubmit complete shop drawing for suspended ceiling. Prior to this date, on 9 Aug 09, you submitted for a ceiling suspension system, specification 09 20 00, Metal Support System Data. I reviewed this submittal and gave it a code "E" and informed you to provide the information under the correct specification. My comments were: "Provide the correct specification section, 09 22 00, Supports for Plaster and Gypsum Board. Provide correct shop drawings per the specifications, submit for erection of metal framing, provide a drawing with details, include material sizes, thicknesses, and fastenings."

It would appear that GWB[7] ceilings were planned by what was submitted, then made up a second submittal for acoustical ceilings on 13 Aug 09. When you provided me with the resubmittal on 22 Jan 10, I gave it a code "E", that the system submitted did not meet the contract requirements, Baker Drawings.

* * *

Maybe Tom needs to read these comments.

(R4, tab 265 at 8381-82) By email dated that same day, Mr. Anness responded, "George, I totally agree ill [sic] forward these comments to him now. Once again thanks." (R4, tab 265 at 8381)

68. A QAR dated February 3, 2010, indicates that Mr. Edgington, and Darren Dyer, also a government quality assurance representative, conducted a site visit of the administration building and M&O (middle/ordinary) barracks. Mr. Dyer noted that the ceiling grid was "not installed properly, wire should have 3 turns securing it back to itself." Mr. Edgington noted:

IF THE DECISION IS TO KEEP THIS CEILING
SYSTEM ALL WIRES WILL HAVE TO BE REDONE,

[7] We assume that this acronym meant gypsum wallboard.

26

THERE IS ONLY A HOOK HOLDING UP THE CEILING GRID, SHOULD BE AT LEAST THREE WIRE WRAPS PER THE ASTM C 636. NO DECISION HAS BEEN MADE YET, IF THE ACOUSTICAL SYSTEM WILL STAY OR BE REPLACED WITH THE SUSPENDED GWB CEILING SYSTEM. I SENT THE CONTRACTOR ALL THE CORRECT SPEC SECTIONS FOR GWB OR ACOUSTICAL CEILING SYSTEMS PLUS THE ASTM FOR ACOUSTICAL SYSTEMS. THE CONTRACTOR HAS RECEIVED ROOF UNDERLAYMENT AND WILL START INSTALLATION TOMORROW.

(R4, tab 201 at 2751)

69. By email dated February 3, 2010, Timothy Taylor, Resident Engineer, Kandahar Vicinity Resident Office, contacted Joseph A. Wade, Chief, Contract Administration Branch and Administrative Contracting Officer (ACO), stating, in part:

> I have a question I was hoping you could answer for me. Just to give you a quick background on this subject, our JRAC BP site has started installing an acoustical ceiling grid system throughout their buildings. The original Baker design drawings and specifications show a plaster ceiling system. The Ktr has submitted their acoustical system in their designs. These designs were approved with no comments on the ceiling system. The COE personnel at that time did not correct the mistake and have basically approved the mock ups, samples and submittals.
>
> The problem we have is that the user wants the plaster ceiling and not the acoustical ceiling. Based on the previous approvals can we make them change back to what was on the original Baker design and specifications without any modification repercussions?
>
> Any assistance in responding to the Ktr would be appreciated.

(App. supp. R4, tab 134 at 22294)

70. By email dated February 3, 2010, Mr. Wade responded to Mr. Taylor, stating:

If the submittal was not marked as a deviation requesting a change from plaster to lay-in ceiling, then whatever the original RFP for the project states is what we should receive contractually, unless we have a mod changing the ceiling system.

An approved submittal that deviates from the RFP does not change the contract requirements unless that submittal was checked "deviation" by the contractor when submitted.

(App. supp. R4, tab 134 at 22293)

71. By Serial Letter No. C-0029, dated February 3, 2010, Mr. Wade informed ECCI:

The ceiling system that is currently installed is noncompliant and does not meet with contract requirements. You are hereby directed to install the ceiling system per the contract requirements referenced above. Please provide your plan to correct this work no later than February 10, 2010.

The above does not constitute a Contracting Officer's Final Decision. You are afforded the opportunity to request such a decision in accordance with FAR clause 52.233-1 entitled "Disputes."

(R4, tab 36)

72. By email dated February 3, 2010, August Ochabauer, ECCI Vice President of Construction, asked Mr. Anness "[w]hat the heck happened here?" (R4, tabs 266 at 8384, 369 at 99). By email that same day, Mr. Anness responded:

We were installing the ceiling that had been approved on the 65% design and had no comments on the 99% design. While I was on leave back in July our team led by Skip Melton did a Mockup room with the drop ceiling, drywall, Metal studs and insulation. The COE gave us a verbal approval on it. We have been going by the 65% approved on the project then the 99% design had been submitted with no comments on the drop ceiling. The way all of this was discovered was one afternoon

28

George Edgington was asking about the insulation how we were installing it and went back to the COEs office and went to look at his drawing the only drawing he had was and [sic] old 35% drawing then he discovered all of this. We had been installing the ceilings for a couple of weeks and the COE was very pleased with it until George found this mistake. ECCi had review [sic] the 65% and the 99% drawing [sic] and no one had caught it including me. That's how all of this came about. RSCC change [sic] the Baker drawing and no one caught it when the designs were reviewed.

(R4, tab 266 at 8384)

73. By email dated February 5, 2010, Mr. Stoneham stated:

ALL,

I think we need to respond with a plan to install a sheetrock ceiling as lath and plaster is not appropriate for the roof structure as designed by Baker nor is it appropriate for this application. If a "hard" ceiling is required, a sheetrock ceiling should be installed.

We also need to end our letter that we plan on pursuing an REA for this change since USACE had previously "approved" the acoustical ceiling.

Joe,

I doubt that RSCC is capable of generating the submittal for this change from the Baker drawings and specifications. Can you or someone from the design team in the conference room assemble this in time for the 10 Feb response date?

(R4, tab 270 at 8399-400)

74. By email also dated February 5, 2010, Mr. Ochabauer responded to Mr. Stoneham's email, stating "[a]bsolutely correct. We need to do the design for the sheetrock ceiling and have RSCC build it. Be advised that sheetrock and sheetrock screws are very expensive in Afghanistan." Mr. Stoneham responded to Mr. Ochabauer by email dated February 5, 2010, stating "Bob had mentioned that

USACE wanted the sheetrock ceiling and are supportive of it. My intent was to show them we are on board with it and moving in that direction." (R4, tab 270 at 8399)

75. According to ECCI's submittal registry, on or about November 6, 2009, ECCI submitted its transmittal for the 99 percent design (app. supp. R4, tab 174).[8] On February 10, 2010, USACE cleared ECCI's 99 percent design submittal for construction - which included the acoustical ceiling tile system - with a C-code (C- Cleared for Construction, except as noted in attached comments, resubmission required) (app. supp. R4, tab 174, finding 16). The DrChecks comments did not mention the acoustical ceiling system in the 99 percent design submittal (app. supp. R4, tab 176).

**Alternate Ceiling Design Proposal**

76. By email dated February 11, 2010, Bob Anness informed John Anness:

> The contractor had changed the Baker Drawings without and [sic] RFI. The COE did not cath [sic] it or ECCi did not catch it. RSCC had already installed the ceilings in M&O Barracks 1-8 and Admin. Bldg about 50%. The COE at this time caught the mistake and issued Serial Letter No.C-0027. Then we responded to this. The COE responded with this other serial letter no.C-0029. We were told to tear out all suspended ceilings. RSCC is going to purpose [sic] to install light gage channel and drywall. RSCC and August Ochabauer ECCi had a meeting and August agreed to pay for one half of the suspended ceiling and half if the light gage Chanel [sic] and drywall. John at this time August (ECCi) did not agree to pay any labor.

(R4, tab 275)

77. On March 6, 2010, ECCI responded to Serial Letter No. C-0029, informing the government that it would "seek an equitable adjustment for the additional time and cost required to comply with this Change," but would "remove the currently installed ceiling as directed." ECCI also proposed the installation of gypsum board in lieu of plaster on metal lath:

> ECCi believes the client would be better served if the specified painted plaster on metal lath ceiling be replaced

---

[8] It appears that the record does not contain a copy of the 99 percent design submittal (ENG Form 4025).

with a painted gypsum board ceiling. Therefore we propose to change the ceiling design to a painted gypsum board ceiling. The gypsum board has previously been approved with and [sic] A code on 17 Sep 09. For the ceiling support system we will follow the Baker drawings and specifications. For reference we have attached our submittal for the metal support system that the gypsum board would attach to.

(R4, tab 284 at 8498)

78. On March 7, 2010, USACE responded with Serial Letter C-0032 agreeing to installation of gypsum board (R4, tab 286).

**ECCI's REA**

79. By letter dated May 12, 2011, ECCI submitted a Request for Equitable Adjustment (REA), in the amount of $912,631.00, based upon the removal and replacement of the acoustical tile ceilings (R4, tab 39 at 1659-766).

80. By letter dated September 11, 2011, the Government requested ECCI submit current cost or pricing data in support of its REA, pursuant to FAR 15.406-2, Certificate of Current Cost or Pricing Data (R4, tab 40 at 1767).

81. By email dated September 14, 2011, ECCI informed the government it would not submit a Certificate of Current Cost or Pricing data until its REA was negotiated (R4, tab 41 at 1770).

82. By letter dated September 15, 2011, the government informed ECCI that because its REA exceeded $750,000.00, the CO would request an audit by the Defense Contract Audit Agency, which required the contractor submit a Certificate of Current Cost or Pricing (R4, tab 41 at 1770).

83. By letter dated October 10, 2011, ECCI stated, in part:

Further to Serial Letter No. 0056, stating that as the ECCi REA proposal costs exceeded $750,000.00, the Government would be conducting an audit. ECCi would now ask the Government to reconsider and accept a revised pricing which is lower than the $750,000.00 threshold.

We have included a break down of our pricing in order for the Government to perform a reasonableness of the revised pricing.

| | | |
|---|---|---|
| 1) ECCi Costs | | $265,377 |
| 2) Subcontractor Costs | | $351,571 |
| 2) [sic] Mark Ups | | $129,272 |
| | TOTAL | $746,220 |

(R4, tab 354 at 9612)

**ECCI's Release of Claims**

84.  Glenn Sweatt, ECCI General Counsel, executed a Release of Claims dated October 16, 2011, for all claims arising under Contract No. W917PM-07-D-0015, Task Order No. 0006, with the exception of "REA for Dropped Ceilings, dated October 10, 2011, in the amount of $746,220, M&O Barracks, Kandahar, Afghanistan" (R4, tab 356 at 9622-24).

**Government Denial of REA and ECCI Response**

85.  By letter dated October 30, 2011, Roberto Chevres, Chief Contract Administration Branch, rejected ECCI's REA in the amount of $746,220 (R4, tab 44).

86.  By letter dated January 2, 2013, ECCI responded to Mr. Chevres's letter, stating, in part:

> Since the receipt of Govt. Serial letter C-0058 on October 30, 2011, ECC has performed an additional analysis of the Subject REA.  We have carefully considered the Govt.'s arguments and are unable to agree with the Govt. that the REA lacks merit.
>
> ECCI has therefore updated the REA and provides legal analysis for the Govt.'s consideration.  We request that the Contracting Officer provide his/her Final Decision (COFD) after considering the additional information.
>
> ECCI's updated REA is for $925,216.  This figure includes the $912,631 provided by the May 12, 2011 REA and $12,585 of fees from our counsel.  The schedule extension request of 100 days, identified in our May 12, 2011, [sic] has not changed.

32

(R4, tab 45)

87. ECCI's January 2, 2013, letter, included an "Updated REA Certification," signed by Mr. Sweatt, stating:

> The following certification is provided in accordance with the requirements of DFARS 252.243-7002 Requests for Equitable Adjustment.
>
> I certify that the request is made in good faith, and that the supporting data are accurate and complete to the best of my knowledge and belief.

(R4, tab 45 at 1795)

**ECCI's Request for Final Decision and Government Response**

88. By letter dated February 4, 2013, ECCI retracted its January 2, 2013, letter, and submitted a new REA and request for a final decision. The amount sought - $925,216 - was the same as in its January 2, 2013 submission. (R4, tab 46 at 1796) The submission included a "Certification" signed by Mr. Sweatt, dated May 11, 2011:

> I certify that the revised request herein (under Prime Contract No. W917PM-07-D-0015, Task Order 006, REA for Dropped Ceilings, M&O Barracks in Kandahar, Afghanistan) is made in good faith, and that the supporting data are accurate and compete to the best of my knowledge and belief (as of May 11, 2011).

(R4, tab 46 at 1812) (underlining in original) This certification previously was submitted to the government by appellant with its letter dated May 12, 2011 (R4, tab 39 at 1664).

89. By letter dated June 6, 2013, ECCI noted it had not received from the CO a final decision on its February 4, 2013, REA, and opined that its failure to provide "a formal Disputes Clause certification" may have been the reason. ECCI submitted with its June 6, 2013, letter, a claim certification and requested a CO's final decision on its February 4, 2013, REA (which also had requested a final decision). (R4, tab 2 at 16) The certification was signed by Mr. Sweatt on May 23, 2013, and stated:

> I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of

my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which ECC believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

(R4, tab 2 at 17)  We find that this submittal was based on the same operative facts as the October 10, 2011 REA.

90.  By letter dated July 10, 2013, CO Tina A. Frazier responded to ECCI's earlier January 2, 2013, REA and request for a final decision, which ECCI already had withdrawn and replaced with its February 4, 2013, REA and request for final decision. Ms. Fraizer's letter stated, in part:

> This letter is issued in response to your request for a Contracting Officer's Final Decision (COFD) in regard to ECC International's (ECCI) Request for Equitable Adjustment (REA), reference (k).  This REA requests an additional $925,216 and one hundred (100) additional days to the contract duration.  As mentioned by ECCI's request for COFD in ref (k), the $925,216 figure includes $912,631 previously provided by ECCI's REA ref (d), and an additional $12,585 for counsel fees.  ECCI originally submitted an original REA on 12 May and a revised REA on 10 October 2011, references (f) and (i), respectively.

(R4, tab 47 at 1813)

91.  Ms. Frazier denied ECCI's REA, stating, in part:

> The Suspended Ceiling issue of the above referenced contract has been reviewed as requested.  Based on the above facts and analysis, the Request for Equitable Adjustment is determined to be without merit.  The contractor's additional $12,585 counsel fees which are mentioned in the first paragraph of this letter are also costs without merit.  See FAR 31.205-47 Costs related to legal and other proceedings Reference (n) paragraph (f).
>
> Additionally, the contractor has requested a Contracting Officer's Final Decision (COFD).  However, the contractor has not provided a certified claim in accordance with the Disputes clause of the contract.  Accordingly, the contractor's request for a COFD is invalid.  This letter

34

issuance is the Contracting Officer's determination
regarding your Request for Equitable Adjustment.
Regarding any further actions on this matter, you are
referred to FAR Clause 52.233-1 Disputes, reference (a).

(R4, tab 47 at 1817)

92. The CO did not issue a final decision on ECCI's June 6, 2013, claim, and the contractor filed its notice of appeal with the Board on the basis of a deemed denial (R4, tab 1 at 6).

DECISION

## I.      The Government's Motion to Dismiss

The government's Rule 11 brief includes a motion to dismiss appellant's appeal for lack of jurisdiction, alleging improper claim certification (gov't br. at 2-3). To understand the jurisdictional quagmire proffered by the government, it is important to note that the claim at issue in this appeal, according to the government, is ECCI's February 4, 2013, request for a final decision, in the amount of $925,216, which was certified on May 23, 2013 (gov't br. at 2). It also is important to note that on October 16, 2011, ECCI released all claims arising pursuant to the Task Order, except the "REA for Dropped Ceilings, dated October 10, 2011, in the amount of $746,220" (finding 84).

The government maintains that the May 23, 2013, claim certification is defective vis-à-vis the October 10, 2011, letter, both in the amount claimed "and in the supporting documentation," because the May 23rd certification was submitted with a claim that exceeded by almost $200,000 the amount that ECCI specified in its release of claims (gov't br. at 2-3). Specifically, the government argues, "[s]ince Mr. Sweatt signed the October 16, 2011, Release of Claims stating that the only exception to the Release was the REA in the amount of $746,220, the Certification Statement in the Claim at issue in this matter is inaccurate. The only claim that could be maintained under this Contract after the Release of October 16, 2011, was the specific claim of October 10, 2011, in the amount of $746,220." (Gov't br. at 2) The government likewise argues that ECCI's claim was not certified in good faith because the claim amount certified exceeded the amount ECCI identified in its October 10, 2011, REA (gov't br. at 2-3).

The record establishes that the government was less than exacting in its handling of ECCI's REA and its various requests for a final decision. The CO issued a letter dated July 10, 2013, denying ECCI's January 2, 2013, REA and request for a final decision, even though ECCI had, by letter dated February 4, 2013, withdrawn the January 2, 2013, REA, and substituted it with a new REA and request for a final

decision (findings 88, 90). The CO's letter rejected the January 2, 2013, REA, stating that, although ECCI requested a CO's final decision, ECCI had failed to provide "a certified claim in accordance with the Disputes clause of the contract," and, therefore, "the contractor's request for a COFD is invalid" (finding 91). Although the CO's July 10, 2013, letter, was correct in that the January 2, 2013, submission (and for that matter the February 4, 2013, revised claim) included a certification that did not comport with the contract's Disputes clause, FAR 52.233-1(d)(2)(iii),[9] the CO's failed to recognize that, by letter dated June 6, 2013, ECCI had previously provided the requisite claim certification, signed by ECCI's general counsel on May 23, 2013 (findings 88-89).

ECCI's original REA, dated May 12, 2011, requested $912,631.00 (finding 79). To avoid the necessity of a DCAA audit, ECCI lowered the amount to below $750,000.00, via its October 10, 2011, letter (finding 83). Subsequent to the government's October 30, 2011, letter, rejecting ECCI's REA in the amount of $746,220.00, ECCI responded with a letter dated January 2, 2013, updating its REA in the amount of $925,216.00, and requesting a CO's final decision. The January 2, 2013, claim included both the $746,220.00 sought in ECCI's October 10, 2011, letter, as well as additional amounts sought in its May 12, 2011, REA, which ECCI had deleted to bring its claim under $750,000.00. (Finding 86)

The government argues that "[t]he Claim at issue in this matter is not based on the REA excepted from the release. It is based on an REA dated February 4, 2013, in the amount of $925,216" (gov't br. at 4, citing R4, tab 2 at 23). ECCI counters the government's argument, noting, correctly, that the February 4, 2013, claim, is based upon the same operative facts as the October 10, 2011, REA (app. reply br. at 2-3, citing *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed. Cir. 1990)). We agree that ECCI's February 4, 2013, claim, certified by ECCI on May 23, 2013, encompassed ECCI's October 10, 2011, REA, and that the two submissions present the same "claim."

Government correspondence establishes that the government viewed ECCI's January 2, 2013, request for a final decision as including costs sought by ECCI in its October 10, 2011, REA. The government's July 10, 2013, letter, discussing appellant's request for a final decision, did not mention ECCI's earlier release, did not raise it as a basis for denying the claim, and did not object to the increase in that claim

---

[9] The REA certification submitted by ECCI, which set forth two of the required CDA certification elements, was correctable pursuant to 41 U.S.C. § 7103(b)(3)). *Kirlin Builders, LLC*, ASBCA No. 61901, 20-1 BCA ¶ 37,485 at 182,072 (citing *Hejran Hejrat Co. v. U.S. Army Corps of Eng'rs*, 930 F.3d 1354, 1359 (Fed. Cir. 2019); *Air Services, Inc.*, ASBCA No. 59843, 15-1 BCA ¶ 36,146 at 176,425-27).

to $925,216.00, as exceeding the amount reserved by ECCI in its release.  Indeed, the CO noted that ECCI's request for $925,216.00 included amounts previously sought in ECCI's "original REA on 12 May and a revised REA on 10 October 2011." (Findings 90-91)[10]

We do not agree with the government's assertion that, because ECCI's May 23, 2013, certification was for an amount in excess of $746,220 – the amount excepted by the release – the certification was ipso facto not in good faith.  The government cites no legal authority for such a proposition and we know of none.  Mr. Sweatt, in signing the certification, attested to his belief that the claim was made in good faith, that the supporting data was accurate and complete to the best of ECCI's knowledge and belief, and that the amount requested accurately reflected the adjustment ECCI believed the government was liable.  Whether ECCI is entitled to more than the amount excepted by the release is a question of law.  *Cubic Defense Applications, Inc.*, ASBCA No. 58519, 18-1 BCA ¶ 37,049 at 180,371 (scope of release is question of contract interpretation); *Kirk Bros. Mechanical Contractors, Inc.*, ASBCA No. 43347, 93-1 BCA ¶ 25,372 at 126,360 (interpretation of release involves question of law); *Reinhold Const., Inc.*, ASBCA No. 33313, 90-1 BCA ¶ 22,453 at 112,724 (increase in claim amount on appeal "must be reasonably based on information not readily available at the time the claim was submitted and not the result of deliberate understatements or careless initial appraisals of the claim") (citing *Tecom, Inc. v. United States*, 732 F.2d 935, 937–938 (Fed. Cir. 1984)).[11]

We have jurisdiction to consider appellant's challenge to the CO's deemed denial of ECCI's claim.  The government's motion to dismiss is denied.

## II.  ECCI's Claim for Additional Costs

### A.  MATOC and Task Order Design Requirements

---

[10] In addition to the affirmative defense of release, the government argues that appellant's claim is barred by waiver and accord and satisfaction (gov't br. at 3-6).  All three affirmative defenses are based upon the premise that appellant's February 4, 2013, claim, cannot be maintained here because ECCI released all claims except its October 10, 2011, REA.  Because we found that the February 4, 2013, claim, and the October 10, 2011, REA, are based upon the same operative facts (finding 89), we reject the government's affirmative defenses as based upon an inaccurate factual predicate.

[11] Given our decision on the merits, we need not address the potential monetary impact to ECCI's claim of its earlier request that the government "reconsider and accept a revised pricing" below "the $750,000.00 threshold" (findings 82-83).

There is no dispute that the Baker drawings set forth in the Task Order specified installation of ceilings constructed of plaster on metal lath (finding 40). Contemporaneous, internal contractor emails establish that ECCI's subcontractor, RSCC, was responsible for the decision to install the suspended acoustical tile ceiling (findings 72, 76).[12] Documents RSCC prepared, and ECCI submitted to the government, did not indicate that the acoustical tile ceiling included in its design was a variation of Task Order minimum requirements reflected in the Baker drawings (findings 31, 47, 51-52).

ECCI argues it was not required to notify the government of this variation in its design because the Task Order was design-build, which thereby provided ECCI with the discretion necessary to design the project however it saw fit (app. br. at 25-26, 29). In its motion for summary judgment, the government identifies the Task Order as a design-bid-build, with a "site-adapt" component, requiring the contractor to construct the project utilizing the design provided in the Task Order, with certain modifications necessary to adapt the design to the specific site (gov't mot. at 14; *see also* finding 67).

As noted by the United States Court of Federal Claims in *Fluor Enterprises, Inc. v. United States*, 64 Fed. Cl. 461, 482 (2005) (internal citation omitted):

> "Design–Bid–Build" and "Design–Build" are industry
> terms referring to the method by which infrastructure
> projects are procured. Design-bid-build is a "segmented
> delivery strategy in which design is fully separated from
> construction." In this model, the services of a design
> professional are procured first, and the building contractor
> is selected later, after the design work is completed.
> Conversely, in the design-build model, both design and
> construction services are procured from a single entity
> (which might be a single construction firm with in-house

---

[12] Appellant alleges in its complaint that ECCI "reasonably interpreted" and "reasonably bid design and installation of acoustical tile ceilings for the buildings required by the RFPs" (finding 45). The sworn statement of David Gunn, one of ECCI's program managers, states "I affirm that it was always ECCI's intent to propose and install acoustical ceiling tiles, and not plaster on lath," although he provides no factual context for his statement (app. supp. R4, tab 163 (1/25/2019 sworn statement of D. Gunn at 7 ¶ 29)). Even assuming RSCC submitted its proposal contemplating installation of an acoustical tile ceiling (the record copy of RSCC's proposal contains no breakdown of its price (R4, tab 200)), ECCI's internal emails suggest it did not appreciate the import of RSCC's ceiling choice until after award, when the government raised the issue (findings 72, 76).

design professionals or a team of construction and design professionals assembled for a project) in a single procurement process.

The distinction between design-build and design-bid-build is somewhat analogous to the distinction between performance specifications, which "set forth an objective or standard to be achieved, and the contractor may use its ingenuity to select the means to achieve that objective or standard of performance while assuming responsibility for meeting contract requirements" and design specifications, "which describe in precise detail the materials to be incorporated and the manner in which the work is to be performed." *American Ordnance LLC*, ASBCA No. 54718, 10-1 BCA ¶ 34,386, at 169,780 (citing *J. L. Simmons Co. v. United States*, 188 Ct. Cl. 684, 689, 412 F.2d 1360, 1362 (1969)). Of course, "[c]ontracts may have both design and performance characteristics; the former limit the contractor's flexibility, while the latter grant some leeway in how the work is to be accomplished." *American Ordnance*, 10-1 BCA at 169,780. Ultimately, the issue to be decided is not the label accorded to the contractual provisions, but rather how much discretion those contractual provisions grant the contractor in designing the project. *Blake Constr. Co., Inc. v. United States*, 987 F.2d 743, 746 (Fed. Cir. 1993) ("It is the obligations imposed by the specification which determine the extent to which it is 'performance' or 'design,' not the other way around)."

The MATOC envisioned that some task orders would include "the execution of design-build construction work," and contained numerous specifications referencing elements of design-build contracting (findings 1, 3-4, 7, 9, 14-18, 20-21, 23). However, the MATOC did not suggest that design-build was the sole contracting vehicle. Indeed, the MATOC scope of work prefaces, "*where design-build services are required* the contractor shall employ the services of architect/engineering professional" (finding 3 (emphasis added)).

The Task Order scope of work referenced a design-bid-build approach, but anticipated that modifications to the technical requirements would be necessary to "to meet site conditions" (findings 34-35). The Task Order contained "minimum requirements," although the contractor was "encouraged to propose alternate design or products (equipment and material) that are more commonly used in the region" (finding 38). The Task Order also provided that "site improvement work shall include the preparation of design documents and the subsequent construction of the site improvements described" within in the Task Order technical requirements and drawings, "with modifications to fit the actual site selected" (finding 34). Indeed, ECCI's design narrative, prepared by RSCC, its subcontractor and designer, likewise recognized the requirement to site adapt the design based upon site conditions (finding 51).

The MATOC required the contractor to ensure and verify to the government that its design was in strict conformance with its requirements, and provide sufficient detail to allow a ready determination by the CO of compliance or deviation (findings 6-9, 14, 21, 23-25, 28). As noted above, RSCC made the decision to install an acoustical tile ceiling in most of the project buildings, rather than the Task Order-specified lath and plaster ceiling (findings 51-52, 72, 76). Internal contractor emails establish that ECCI's own construction manager was unaware of RSCC's design deviation from the Task Order requirements until notified by the government (findings 67, 72, 76).

Implementation of RSCC's design decision by ECCI was not in accordance with MATOC and Task Order requirements requiring the contractor to notify the government that its design did not meet minimum requirements (findings 5, 11, 13, 28, 30, 34, 38). For example, the initial 65 percent design submittal drawings specified installation of an acoustical tile ceiling in a majority of the project buildings (findings 49-50). Yet appellant certified that its initial 65 percent design submittal drawings contained no variation and was "correct and in the strict conformance with the contract drawings and specifications except as otherwise stated" (finding 48). This certification, as it pertained to the type of ceiling ECCI planned to install, was incorrect, because the Task Order specified lath and plaster, and appellant's 65 percent design submittal drawings specified acoustical tile. In contrast, ECCI's 65 percent design narrative and structural design calculations were based upon, and identified the use of, plaster ceilings (findings 51- 53).[13]

## B.     MATOC and Task Order Notification Requirements

In addition to the requirement that ECCI ensure and certify its submittals were in strict conformance with the drawings and specifications (findings 6-7, 14, 23), the MATOC also placed the onus on ECCI to affirmatively notify the government of any variations in its design (findings 5, 13, 28, 30). The Task Order likewise imposed upon the contractor the "responsibility to show the equivalency of the alternate standard" and

---

[13] Another example of ECCI's noncompliance concerns MATOC paragraph 3.2.2, which required ECCI maintain a construction submittal register "to control all construction submittals throughout the life of the contract" (finding 12). In October 2008, ECCI provided the government a submittal registry listing over 200 specifications, including a specification for acoustical tile ceilings (findings 43-44). On the accompanying ENG Form 4025, ECCI certified "the above submitted items have been reviewed in detail and are correct and in the strict conformance with the contract drawings and specifications except as otherwise stated" (finding 43). Inclusion of the acoustical tile ceiling specifications on the registry was not in strict conformance with the Task Order, as the Task Order drawings did not specify installation of that ceiling type.

the CO was required to "approve its use" (findings 34, 38). The Task Order also specified that any variation "must be approved by the Contracting Officer" (finding 38).

Appellant admits that the MATOC "outlines an extensive approval process for proposing and submitting design variations" (app. cross-mot. at 28). Appellant argues, however, that these MATOC provisions do not apply to the Task Order because paragraph 1.2 of the Task Order Technical Requirements encourages the contractor to propose alternate designs or products commonly used in the region (app. cross-mot. at 28; app. br. at 23).

Appellant's argument fails to take into account the first sentence of paragraph 1.2 of the Task Order Technical Requirements, which states, "[t]hese design and product requirements are minimum requirements." This additional sentence helps explains why paragraph 1.2 also requires the contractor "submit information as requested by the Contracting Officer to make a comparison of the proposed alternate," and that "[a]ll variations must be approved by the Contracting Officer." (Finding 38)

Appellant argues that approval of an alternate design pursuant to paragraph 1.2 "simply requires the contractor to submit information 'as requested by the Contracting Officer'" (app. br. at 23). Appellant's argument leaves unanswered the question how the CO would know to even request such information if the contractor failed to notify the government that its design was an alternate to Task Order minimum requirements. *BYA Int'l LLC*, ASBCA No. 58031, 13-1 BCA ¶ 35,424 at 173,178 (contractor failed to notify government of design variation seeking substitution of metal walls). The MATOC required the contractor to insure that submittals complied with contract requirements, were complete, and in sufficient detail to allow the CO to determine compliance (findings 8-9).

In support of its interpretation of the Task Order's otherwise seemingly-unambiguous notice requirement, appellant relies upon our decision in *Highland Al Hujaz Co., Ltd*, ASBCA No. 58243, 16-1 BCA ¶ 36,336. Appellant argues that although our decision did not address the same technical requirement as the one at issue here, we "paraphrased a substantially similar provision that likewise 'encouraged [the contractor] to propose alternate designs or products that were more commonly used in the region," and that "once a design or product was approved, any variations would require prior approval by the CO" (app. cross-mot. at 29). Appellant draws a distinction between an alternate design and a design variation, suggesting that the requirement in the Task Order that the contractor notify the government of design variations, applied only to alternative designs that already were approved, and not to any alternate design change to the original, Task Order minimum requirements (app. br. at 26-27). According to appellant, "there can be no Variation until the design is approved" (app. br. at 27).

41

Appellant's argument adds restrictive language that simply is not present in paragraph 1.2.  The notion that, based upon this Board's paraphrasing of a "similar" clause in an unrelated contract, ECCI was free to make changes to the Task Order's minimum requirements without approval of the CO - even though the Task Order here plainly states that variations require CO approval - strains credulity.  Moreover, the contract clause in *Highland* (as paraphrased by the Board) provided that "[i]n proposing such an alternate design or product, appellant was required to submit such information as would allow the CO to make a comparison of the proposed alternate design or product to the Corps' minimum requirements."  16-1 BCA at 177,154.

Similar to paragraph 1.2 of the Task Order Technical Requirements, paragraph 1.1 instructs that "[t]he Contractor's design and construction must comply with technical requirements contained herein" (finding 37).  Yet appellant ignores this requirement when quoting paragraph 1.1 in its brief (app. br. at 2, 21-22).  There can be little doubt that the MATOC and Task Order required appellant to notify the government of design changes to Task Order minimum requirements.  *Fortec Constructors*, ASBCA No.  26802, 83-1 BCA ¶ 16,374 at 81,407 ("Appellant did not give the notice of variances required by the clause nor show that the Government representatives who reviewed the submittal were otherwise consciously aware of such variances").

Appellant offers a similar, overly restrictive reading of paragraph 2.1 of the Task Order Scope of Work, with a selective quotation of that provision, stating, "[t]he contractor **shall design** and construct the site improvements and **facility modifications to meet site conditions** . . ." (app. cross-mot. at 7, citing R4, tab 19 at 1823) (emphasis supplied by appellant).  A more fulsome reading of paragraph 2.1 provides, "[t]he contractor shall design and construct the site improvements and facility modifications to meet site conditions as a design-bid-build contract and shall be in accordance with the requirements stated in Section 01015: Technical Requirements" (finding 35).  ECCI was not free simply to ignore the Task Order's minimum requirements.

Appellant proffers the sworn statement of Mr. Gunn, stating that he interpreted the Task Order Scope of Work, paragraph 1.1, and Task Order Technical Requirements (01015), paragraph 1.2, "to mean that ECCI was to act as the design-builder on the project" (app. br. at 2, citing app. supp. R4 tab 163 (1/25/2019 sworn statement of D. Gunn at 1-2)).  However, assuming Mr. Gunn so interpreted the Task Order, this even more so should have led ECCI to conclude that it was required to follow MATOC specifications requiring the design-build contractor verify whether its design was in strict conformance with contract requirements (findings 6-7, 14, 23), and notify the government accordingly if it was not.

It is well settled that "[w]here contract provisions are clear and unambiguous, they must be given their plain and ordinary meaning," *Alaska Lumber & Pulp Co., Inc. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993) (citing *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 579 (Fed. Cir. 1987)). "When the contractual language is unambiguous on its face, our inquiry ends and the plain language of the Agreement controls." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040-1 (Fed. Cir. 2003). The MATOC and the Task Order are clear; appellant was required to obtain approval from the CO for design changes to the Task Order's minimum requirements, whether presented as a variation set forth in an ENG Form 4025 submittal or as an alternate design submittal. We decline appellant's invitation to hold otherwise.

## C.    No Cost Change

ECCI argues that it was not required to notify the government of its change to the Task Order minimum requirements because it was "empowered" to submit its alternate design as a no-cost change (app. br. at 21-23). There is no dispute that the Task Order encouraged ECCI to submit alternate designs. However, appellant cites no provision that expressly states the contractor need not inform the government of an alternate design to a Task Order minimum requirement if the alternate design involves a no cost change.

Paragraph 3.6.4 of the MATOC, entitled "Variations," required the contractor to justify variations set forth in design documents or construction submittals at the time of submission (finding 13). Appellant labels the approval process in paragraph 3.6.4 "inapplicable" here (app. cross-mot. at 29). Appellant cites Mr. Gunn's interpretation of paragraph 3.6.4 as not applying "to no-cost modifications to the design undertaken to comply with the requirements of the particular site" (app. br. at 4, 26). However, paragraph 3.6.4 contains no such restrictive language. Indeed, it states, in part, "[i]f design documents or construction submittals show variations from the contract parameters and/or requirements, the Contractor shall justify such variations in writing, at the time of submission. Additionally, the contractor shall also annotate block 'h' entitled 'variation' of ENG FORM 4025." (Finding 13)

Appellant attempts to draw a distinction between MATOC paragraph 1.2.1, which discusses design submittals, and paragraph 1.2.2, which discusses construction submittals, noting that, unlike paragraph 1.2.2, paragraph 1.2.1 makes no mention of "VARIATIONS." According to ECCI, this suggests a contractor is not required to notify the government of variations contained in design submittals (app. br. at 3-4, 25-26). Paragraph 3.6.4 makes no such distinction, and, in fact, mentions both "design documents" and "construction submittals" (finding 13). Moreover, MATOC section 01 33 00, SUBMITTAL PROCEDURES, paragraph 1.3.1, requires approval by the contractor's own designer of record of "any deviations from the solicitation, the

43

accepted proposal, or the completed design," including those reflected in "SD-05 DESIGN DATA submittals" (finding 24).

Appellant argues that MATOC paragraph "3.7.4.1 specifically allows for no-cost changes to the 'drawings and specifications' as a result of Government comments, without submitting such changes as Variations" (app. br. at 27). Appellant likewise argues that during contract performance, the government "directed and approved dozens of no-cost changes to the Baker Drawings during the design review process, without submission as Variations and without Contracting Officer approval" (app. br. at 28). The fly in the ointment that is appellant's argument, however, is that in both scenarios proffered by appellant, the government was on notice of the design variation, and, at times, was even the proponent of the change. As for the acoustical tile ceiling design, the record reflects that ECCI failed to realize its design did not comply with Task Order requirements until the government discovered the non-conformance and raised the issue with ECCI (findings 72, 76).

The factual predicate of appellant's assertion that its acoustical tile ceiling design was a no cost change likewise is incorrect. As noted by the government, "[t]he contention that this change could properly be treated as one that would not affect the contract price is entirely inconsistent with the [appellant's] statements regarding construction of lath and plaster ceilings as compared to acoustical ceilings (gov't br. at 9)." [14] Indeed, appellant's admits as much in its brief, stating "acoustical ceilings were both more cost effective and quicker and more efficient to install than the suspended lath and plaster ceilings in the Baker drawings" and "installation of suspended lath and plaster ceilings is difficult and requires a specialized trade skill and experience to install properly, which was not generally available in Afghanistan" (app. br. at 5).

There can be no dispute that, were ECCI no longer required to install lath and plaster ceilings, installation of an acoustical tile ceiling would have resulted in a decrease in cost of time and materials. Accordingly, the change in ceiling type was not at no cost. *HCS, Inc*., ASBCA No. 60533, 16-1 BCA ¶ 36,502 at 177,855 ("contract price must be equitably adjusted when a change in the contract work causes an increase or decrease in the cost of performance of the work"); see also *Penner Constr. Co*., Appeal Nos. 17607, 17608, 73-2 BCA ¶ 10,048 at 47,141 (government entitled to benefit of its bargain even though it approved contractor drawings, where "error was induced by appellant who should not profit from it").

---

[14] The government cites Mr. Gunn's sworn statement stating that construction of a lath and plaster ceiling is more difficult and costly than construction of an acoustical tile ceiling (gov't br. at 9, citing R4, tab 368 at 6 (*see also* app. supp. R4, tab 163 (1/25/2019 sworn statement of D. Gunn at 6))).

### D. RFI 0009

Appellant argues that it provided "notice of the deviation from the Baker Drawings" through submission of RFI 0009, thus providing the government with "actual knowledge and formal notice of ECCI's intent to use acoustical ceiling system in lieu of the plaster and lath system specified in the Baker Drawings" (app. br. at 14, citing *EM Systems, Inc.*, ASBCA No. 51782, 2001-2 BCA ¶ 31,586 at 156,074). Appellant's argument is incorrect for several reasons.

First, by its own terms, RFI 0009 concerned section "3.4 Exterior Building Envelope," as referenced in the Task Order solicitation, and addressed the proper coating of the interior side of exterior walls (findings 54-55). RFI 0009 inquired whether "gypsum board (drywall) [is] acceptable in lieu of plaster over metal lath" on the interior side of exterior walls, which allegedly would be consistent with other buildings in the area that were not part of this project (finding 54). The RFI did not specifically cite or even reference the MATOC or Task Order ceiling specification. Although the RFI stated that "a suspended/drop ceiling would be used rather than drywall ceiling," even assuming that "suspended/drop ceiling" is a reference to an acoustical tile ceiling, the Task Order here did not call for drywall ceilings, but, rather, called for installation of plaster and lath ceilings. (Finding 54)

Second, appellant suggests that "the Government specifically approved the no-cost change proposed in RFI No. 0009, 'provided the appropriate revisions to the specifications are prepared and approved,'" (app. br. at 14). A more complete reading of the government's "approval" states: "[t]he proposed substitution of Gypsum wallboard in lieu of plaster on lath on the interior of exterior walls is acceptable provided the appropriate revisions to the specifications are prepared and approved." The government's response addressed only the section raised by appellant, 3.4.2, interior wall finish. (Finding 56)

Third, Mr. Kadala, the government employee who signed the RFI, was an environmental engineer. The record contains no evidence that Mr. Kadala was a Contracting Officer's Representative (COR) or had authority to change contract requirements, and appellant does not so argue. Indeed, the RFI form expressly cautioned that an RFI is not the proper vehicle for requesting a change to the contract, stating, it "does not provide authority to proceed with additional work," and that if the contractor believes the RFI response results in a changed condition, the contractor must provide written notice to the COR (finding 54).

ECCI suggests that because the government did not address appellant's statement that "a suspended/drop ceiling would be used rather than drywall ceiling" in its response to the RFI, "the Government is estopped from claiming that its silence regarding the ceilings should be read as a disapproval of the proposed acoustical

ceiling" (app. reply br. at 12) (citing *Mabus v. Gen. Dynamics C4 Sys*, 633 F.3d 1356, 1359 (Fed. Cir. 2011)). To establish equitable estoppel against the government, ECCI must demonstrate "affirmative misconduct" by the government. *United Pacific Insurance Co. v. Roche*, 401 F.3d 1362, 1366 (Fed. Cir. 2005). The facts as proffered by appellant in no way meet that stringent standard.

Notwithstanding ECCI's suggestion to the contrary, RFI 0009 was not "sufficiently clear and formal to put the Government on notice of the deviation or variation" (app. br. at 13, quoting *EM Systems*, 2001-2 BCA at 156,074). Moreover, unlike the facts in *EM Systems*, the government here did not express an understanding that it had approved a variation from the Task Order minimum requirements. *EM Systems*, 2001-2 BCA at 156,073 (finding that government "knowingly approved the variance"). To the extent appellant truly relied upon RFI 0009 as notice to, and government approval of, its installation of an acoustical tile ceiling instead of drywall (which was not even the type of ceiling specified in the Task Order), such reliance was misplaced.[15] RFI 0009 in no way complied with MATOC and Task Order requirements, which placed the onus on ECCI to affirmatively notify the government of any variation between minimum requirements and the contractor's proposed design (findings 5, 13, 28, 30, 38).

E.      **Alleged Government Approval of ECCI's "Alternate" Design**

Appellant argues that the government waived strict compliance with Task Order requirements by approving drawings and samples submitted by ECCI reflecting the acoustical tile ceiling, and by the failure of government quality assurance representatives to object when the acoustical tile ceiling was included in a sample room constructed by appellant (app. br. at 8-11, 15-19). To establish waiver, ECCI must demonstrate that the CO knowingly rescinded the government's right to require compliance with a Task Order minimum requirement. *Swinerton Builders Northwest*, ASBCA No. 57329, 17-1 BCA ¶ 36,738 at 179,014 (internal citations omitted). This especially is true where "the express terms of the contract require that such a waiver be in writing." *Id*. Here, the MATOC and Task Order required written notification of contract changes (findings 13, 28, 30, 38). Appellant proffers no evidence of a written agreement between the parties specifically assenting to ECCI's variation of the Task Order ceiling requirements.

---

[15] The import of RFI 0009, as evidence of notice and approval of the acoustical tile ceiling, is questionable also given appellant's admission that the parties only became aware of the RFI in February 2019, subsequent to filing the parties' cross-motions for summary judgment (app. br. at 7). Indeed, Mr. Gunn, ECCI's project manager, testified that he first became aware of the RFI the morning of his deposition in February 2019 (app. br. at 7; app. supp. R4, tab 179 at 22-23).

The record establishes that appellant did not inform the government that its design reflected a deviation or variation in the Task Order minimum requirements (findings 31, 47, 51-52), and that appellant did not know that it's design was not in conformance with the Task Order requirements until it was informed so by the government (findings 72, 76). The government first informed ECCI on January 20, 2010, that the acoustical tile ceiling was not in conformance with Task Order requirements (finding 64). ECCI took the position that the Task Order was "a design build project that has required significant modifications to the buildings and materials envisioned in the original Government provided design documents in order to adapt to local site conditions and locally available materials" (finding 66). The government responded, "[t]his is not a Design Build project, it is site adapt. You are not authorized to change the Baker Drawings without approval." Tellingly, in a responsive email, Mr. Anness, ECCI's Construction Manager, Mr. Anness stated "I totally agree." (Finding 67)

The government discussed the issue internally on February 3, 2010, with the resident engineer expressing his concern that the design was approved with no comments on the ceiling system, and that "COE personnel at that time did not correct the mistake" and "basically approved the mock ups, samples and submittals" (finding 69). The ACO responded to the resident engineer's concerns that same day, stating, "[a]n approved submittal that deviates from the RFP does not change the contract requirements unless that submittal was checked 'deviation' by the contractor when submitted." (Finding 70) Also that same day, the ACO informed ECCI that the ceiling system as installed was noncompliant with the Task Order requirements and directed ECCI "to install the ceiling system per the contract requirements" (finding 71).

It is against this backdrop that, also on February 3, 2010, August Ochabauer, ECCI Vice President of Construction, asked Mr. Anness "[w]hat the heck happened here?" Mr. Anness responded, stating that Mr. Edgington discovered that the ceiling was not in conformance with the Baker drawings and that "no one had caught it including me. That's how all of this came about. RSCC change [sic] the Baker drawing and no one caught it when the designs were reviewed." (Finding 72)

The government cannot properly be blamed for approving the design when appellant failed to inform the government that its design deviated from Task Order minimum requirements. *Watts Constructors, LLC*, ASBCA No. 61493, 20-1 BCA ¶ 37,563 at 182,387 (no evidence that quality assurance representatives who observed non-compliant contractor work knowingly waived the contractual terms) (internal citations omitted). This especially is true where, as here, the contractor likewise was ignorant of its own change to the Task Order minimum requirements. *Rivera Constr.*

47

*Co., Inc.*, ASBCA No. 29391, 88-2 BCA ¶ 20,750 at 104,853 (coordination and supervision of subcontractor work is responsibility of prime contractor).[16]

In support of its waiver argument, appellant cites numerous decisions imputing to contracting officers the knowledge of other government employees, thereby finding a waiver of contract requirements (app. br. at 17-18, citing, e.g., *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 688 (1994); *Military Aircraft Parts*, ASBCA No. 60009, 16-1 BCA ¶ 36,388 at 177,409). These decisions are of no moment because appellant has not established that government employees here knew appellant's design did not comply with the Task Order minimum requirements.[17] Moreover, the MATOC gave the government "the right to rescind inadvertent approval of submittals containing unnoted deviations" (finding 28).

As for the alleged "approval" of the design by government quality assurance representatives, "[i]t is well established that Government inspectors are provided for the Government's benefit and not the contractor's." *Panhandle Grading and Paving, Inc.*, ASBCA No. 38539, 90-1 BCA ¶ 22,561 at 113,225. The MATOC submittal process placed the burden of contract compliance on the contractor, informing ECCI that government approval of submittals did not relieve ECCI of responsibility for errors or omissions in its design submittals and drawings, or its obligation to comply with contract requirements (findings 7, 9-10, 15-16, 21, 23, 27, 30). "Where the contract places on the contractor the burden of compliance, the presence or absence of a Government inspector does not shift responsibility for the sufficiency of the work from appellant to the Government." *Panhandle Grading*, 90-1 BCA at 113,225 (citing

---

[16] Appellant cites several decisions in support of its waiver argument (app. br. at 16-21). Those decisions are inapposite as they concern the government's knowing waiver of a contractual requirement. *See, e.g.*, *Gresham & Co. v. United States*, 200 Ct. Cl. 97, 117-118, 470 F.2d 542, 554 (1972) (government knew contractor's dishwashing machines did not meet specification requirement); *American West Constr., LLC*, ASBCA No. 61094, 18-1 BCA ¶ 36,935 at 179,948-9 (contractor told government of plans not to fulfill contract requirement of constructing temporary bridges); *Walsky Constr. Co.*, ASBCA No. 36940, 90-2 BCA ¶ 22,934 at 115,125 (government aware contractor not following contract temperature requirements for installation of road sealant).

[17] Appellant also cites our decision in *CATH-dr/Balti Joint Venture*, ASBCA No. 54239, 05-2 BCA ¶ 33,046 at 163,808, for the proposition that knowledge of directive issued by the ROICC/project manager was imputed to the CO. On appeal, however, the United States Court of Appeals for the Federal Circuit held that the issue of ratification presented a material fact and remanded the appeal to Board to determine whether the CO ratified certain actions of the project manager. *Winter v. CATH-dr/Balti JV*, 497 F.3d 1339, 1347 (Fed. Cir. 2007).

*R.S. Construction*, ASBCA No. 22815, 80–1 BCA ¶ 14,369; *W.L. Spruill and Company*, ASBCA No. 14390, 71–2 BCA ¶ 8930); *see Fortec Constructors*, 83-1 BCA ¶ 16,374 at 81,407 ("unwitting Government approval of a noncomplying submittal does not change the contract or estop the Government from demanding strict conformance to the contract") (internal citation omitted).

### F.      Sample Room and Acoustic Tile Submittals

Appellant suggests that the COR approved the sample room, relying as support upon an affidavit and a sworn statement by Mr. Gunn, and a February 3, 2010, internal government email (app. cross-mot. at 12, citing app. supp. tabs 125 (9/20/2017 aff. of D. Gunn at 5), 134 at 22294; app. br. at 8-9, 14, citing app. supp. R4, tabs 163 (1/25/2017 sworn statement of D. Gunn at 7- 8), 173 at 157, and 201 at 2750).  None of the documents cited by appellant even identify the COR who allegedly approved the sample room, let alone establish COR approval.

Mr. Gunn's affidavit and his sworn statement contain only the conclusory allegation that the COR approved the sample room (app. supp. R4, tabs 125 (9/20/2017 aff. of D. Gunn at 5), 163 (1/25/2019 sworn statement of D. Gunn at 7-8).[18]  Mr. Gunn's sworn staement cites as support the contractor's August 25, 2009, QCR, cited also by appellant in its brief (app. supp. R4, tab 163 (1/25/2019 aff. of D. Gunn at 7-8); app. br. at 9, citing app. supp. R4, tab 173 at 157-160).  However, that QCR does not support a finding that the COR approved the sample room.  The QCR makes no mention of the sample room, nor does it state the identity of the COR.  The only mention of the COR in the QCR is in response to the question, "[w]ere there any Delays in Work Progress today?"  The response states, "[w]ork was resume [sic] at 0930H after inspection and verbal approval of COR for the security."  (App. supp. R4, tab 173 at 157)[19]  This cryptic reference to the COR is insufficient to support a finding that the COR approved the sample room or was on notice that the ceiling installed in that room did not comply with Task Order minimum requirements.

The government email cited by appellant (from the resident engineer to the ACO) does not state that the COR inspected or approved the sample room; rather it states the contractor "submitted their acoustical system in their designs.  These designs were approved with no comments on the ceiling system.  The COE personnel at that

---

[18] In his deposition, Mr. Gunn stated that he was not working on the project in July 2009 (app. supp. R4, tab 179 at 21-23), which may explain the lack of factual context in his affidavit and his sworn statement.

[19] Daily QC and QA Reports from July 20 through July 30, 2009, when the sample room was constructed and allegedly approved, contain no reference to a COR observing or approving the sample room (R4, tabs 201 at 2553-63, 202 at 4071-99).

time did not correct the mistake and have basically approved the mock ups, samples and submittals." (Finding 69) The record reflects that Mr. Conner and Mr. Edgington viewed the sample room at some point in time (finding 58). There is no indication that appellant notified these representatives that the ceiling depicted in the sample room was a change to the Task Order minimum requirements. Moreover, Mr. Edgington informed appellant in an email that his viewing of the room was not an inspection (finding 67).

ECCI has presented no evidence that either Mr. Edgington or Mr. Conner had authority to approve a variation to Task Order minimum requirements. *Watts Constructors*, 20-1 BCA at 182,387 ("[w]hether such authority may [even] be delegated to such persons as quality assurance representatives, there is no evidence that they possessed such authority or that the contracting officer was made aware of any waiver of contract terms by them"). Even if Mr. Edgington or Mr. Conner orally accepted the sample room, their acceptance would not negate the government's "right to require correction of non-conforming construction material reflected in" the sample room because ECCI failed to provide notice of the nonconformance. *Ellis-Don Constr., Inc.*, ASBCA No. 51210, 99-1 BCA ¶ 30,346 at 150,072.

Appellant also suggests that the government approved the use of an acoustical tile ceiling through its approval of appellant's Transmittals Nos. 09 51 00-1 and 09 51 00-2, containing product data and samples (app. br. at 8). We note, however, that the transmittals were signed by Mr. Malone with a certification "that the above submitted items have been reviewed in detail and are correct and in strict conformance with the contract drawings and specifications except as otherwise stated." Mr. Malone failed to indicate that the submittals contained a variation in the Task Order requirements. (Findings 60, 63) Thus, his certification that the submittals were "correct and in strict conformance" with the Task Order requirements was simply incorrect. When the Government cleared the acoustical tile samples for construction with a C-code, requiring resubmission "with complete shop drawings for suspended ceiling," the government did so without notice that the submittals contained a variance of the Task Order minimum requirements (finding 61).

### G.    Constructive Change

Appellant argues that the government constructively changed the Task Order when it ordered the contractor to comply with the Task Order requirement of installing a lath and plaster ceiling, and then allegedly directed ECCI to install a gypsum board ceiling (app. br. at 31-32). Appellant states, "[u]ltimately, even if the Board were to determine that the Government was entitled to the lath and plaster ceilings from the Baker Drawings, the Board should still hold that ECCI is entitled to payment for its claim because the direction to install the GWB ceilings was a compensable change" (app. reply br. at 19).

We have held that the government did not waive the requirement that ECCI install lath and plaster ceilings. The MATOC required the contractor to correct non-conforming work at no additional cost or time to the Government (finding 19). The record suggests that, when faced with the prospect of installing lath and plaster ceiling in lieu of the acoustical tile ceiling, ECCI discussed internally its preference for installation of a sheetrock ceiling, rather than lath and plaster (findings 73-74). In his February 5, 2010, internal email, Mr. Stoneham was explicit:

> "I think we need to respond with a plan to install a
> sheetrock ceiling as lath and plaster is not appropriate for
> the roof structure as designed by Baker nor is it appropriate
> for this application. If a "hard" ceiling is required, a
> sheetrock ceiling should be installed."

(Finding 73)

Appellant suggests that the government "requested that ECCI use a GWB ceiling system to replace the acoustical ceiling based system" (app. br. at 10). Appellant cites as support a statement contained in an internal ECCI email from Mr. Stoneham to Mr. Ochabauer sent four hours after Mr. Stoneham's February 5, 2010, internal email quoted above (app. br. at 10, citing R4, tab 270 at 8399). In that subsequent email, Mr. Stoneham stated, "Bob had mentioned that USACE wanted the sheetrock ceiling and are supportive of it. My intent was to show them we are on board with it and moving in that direction." (Finding 74) Although the record reflects that the parties discussed installation of a gypsum ceiling (finding 68), appellant's internal email falls far short of establishing a government request or direction that ECCI install a gypsum board ceiling.[20] Rather, by letter dated March 6, 2010, ECCI proposed to the government that the "specified painted plaster on metal lath ceiling be replaced with a painted gypsum board ceiling" (finding 77). Appellant provided with its letter a "submittal for the metal support system that the gypsum board would attach to," and the government agreed to appellant's proposal the following day (findings 77-78). Appellant's having formally proposed via letter and accompanying submittal a substitution to what was specified in the Task Order, and the government's having agreed to appellant's proposal, there was no constructive change by the government.

---

[20] In its cross-motion for summary judgment, appellant cites Mr. Gunn's statement in his affidavit that the government "acknowledged" lath and plaster ceilings "were not appropriate and instead agreed to installation of gypsum board ceilings in lieu of the lath and plaster" (app. cross-mot. at 15, citing app. supp. R4, tab 125 (9/20/2017 aff. of D. Gunn at 6)). Mr. Gunn provides no factual context for his conclusory statement. Without more, it is of little evidentiary value.

*Optimization Consulting, Inc.*, ASBCA No. 58752, 19-1 BCA ¶37,426 at 181,905 ("[a] constructive change occurs when a contractor performs work beyond the contract requirements, without a formal order under the Changes clause, due either to an express or implied informal order from an authorized government official or to government fault) (quoting *Parwan Group Co.*, ASBCA No. 60657, 18-1 BCA ¶ 37,082 at 180,498).

## H.      Ceiling Requirements on Other Task Orders

Appellant argues that on other task orders, for example 0004 and 0005, appellant "proposed and the Government accepted suspended acoustical ceilings in lieu of the lath and plaster ceilings which were inappropriate for Afghanistan" (app. br. at 5-6, app. cross-mot. at 10). However, on those task orders, ECCI and the government specifically agreed to the use of an acoustical tile ceiling as a variation to the task orders requirements (app. supp. R4, tab 80 at 1). Indeed, in response to an email from ECCI on this issue, the government stated "[y]ou should have a 4025 in hand approving this as a variation" (app. supp. R4, tab 80 at 3).

Appellant also states that "Baker began preparing new standard designs in 2010 which were included in numerous task orders and stand-alone contracts" and that "[n]one of the new Baker standard drawings included suspended lath and plaster ceilings" (app. cross-mot. at 10). Even if true, such changes by Baker, incorporated into subsequent task orders by the government, are not evidence of the government's liability to appellant here. *Intram Co.*, ASBCA No. 44159, 94-1 BCA ¶ 26,375 at 131,180 ("The fact that the Government clarified the contract requirements in the follow-on contract has no bearing on interpretation of this contract. Subsequent remedial measures are not evidence of liability (Fed. R. Evid. 407)"). Here, the Task Order required installation of lath and plaster ceilings. The fact that the parties agreed to a variation on other task orders has no bearing on this Task Order, and, indeed, suggests that appellant was aware of the manner in which such variations in design were to be processed pursuant to the MATOC, but did not take those steps here.

<u>CONCLUSION</u>

The government's motion to dismiss is denied and the parties' cross-motions are dismissed as moot.  We have considered appellant's remaining arguments and find they have no merit.  The appeal is denied.

Dated:  August 25, 2020

DAVID B. STINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58875, Appeal of ECC International, LLC, rendered in conformance with the Board's Charter.

Dated:  August 25, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals